IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GINGER HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:05-cv-823-MEF |
| | ) | (WO) |
| MEDICAL CENTER ENTERPRISE | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ginger Henderson brings suit against Medical Center Enterprise (hereinafter "MCE") alleging violation of the Emergency Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). This cause is presently before the Court on Defendant's Motion for Summary Judgment (Doc. # 19).

**I. Jurisdiction and Venue**

The Court exercises subject matter jurisdiction over this action pursuant to EMTALA and 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations of each.

**II. Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the non-movant).  After the non-moving party has responded to the motion for summary

2

judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)).

### III. Facts[1]

At approximately 4:00-5:00 p.m. on November 30, 2004, Plaintiff Ginger Henderson was involved in an automobile accident between Geneva and Enterprise, AL. She was driving around a curve when another vehicle ran a stop sign and hit the front of her driver's side door. She sustained minor injuries, such as cuts and scrapes from the air bag and bruising from the seat belt. Her son was in the car as well, but sustained no injuries. At the time, she was approximately 38 weeks pregnant. Emergency personnel responded to the scene of the accident. Mrs. Henderson declined an offer from the medical personnel to be transported to the hospital via ambulance because she wanted to speak with her obstetrician

---

[1] In setting forth the facts to be considered on summary judgment, the Court has taken into consideration its ruling on Defendant's Motion to Strike (Doc. # 30).

first. She used her cell phone to call her husband, Matthew Henderson, who picked her and her son up from the scene and took them home.

After arriving at home, Mrs. Henderson attempted to call her obstetrician. She spoke with the doctor on call that evening at her obstetrician's group, Dr. Patel. She told Dr. Patel about the accident and stated that the contractions she had been having throughout the pregnancy were getting closer together. Dr. Patel advised her that he wanted her to be checked and he wanted to have the baby's vitals checked. He advised her to go to MCE because the Hendersons lived in Enterprise and MCE was the closest hospital to them. He said he would fax the paperwork to MCE so that everything would be ready once she got there.

Mr. Henderson called his parents and asked them to pick up the Hendersons' son so that they could go to the hospital. Mr. Henderson then drove Mrs. Henderson to MCE, dropped her off at the door, and went to park the truck. MCE surveillance cameras show that Mrs. Henderson entered the hospital at approximately 6:58 p.m., and that Mr. Henderson entered at approximately 7:00 p.m. Upon entering the hospital, Mrs. Henderson went to the emergency department clerk and told her that she was pregnant, that she had been involved in an automobile accident earlier in the day, and that she was having contractions two minutes apart. The clerk asked her to wait while she finished with the patient she was with at the time. Mrs. Henderson sat at the next cubicle and waited.

According to Mrs. Henderson, Mr. Henderson arrived while she was waiting.[2] Upon his arrival, Mrs. Henderson asked him to help time her contractions. During the time they were waiting, Mrs. Henderson had two contractions, each two minutes apart. Based upon the number of contractions and their timing, Mrs. Henderson estimated that they waited about four minutes.

When the clerk was finished with the other patient, the clerk asked Mrs. Henderson to move over to her cubicle. She took Mrs. Henderson's personal information and began to type it in. She told Mrs. Henderson that she would have to call the labor and delivery (hereinafter "L&D") department. The clerk called a nurse in the L&D department and relayed the information to the nurse. The clerk then told Mrs. Henderson that the on-call obstetrician was being contacted by the L&D nurse and that the obstetrician would decide whether or not he would see her. Mrs. Henderson said, "So you're telling me after we wait for you to contact the OB, there's still a chance he may not see us?" The clerk said, "Yes, because you're not one of our OB patients. It's our policy that we don't see OB patients that are not regularly seen by our OB physicians." Mrs. Henderson then said, "Well, I don't want to wait, so if there's a chance that he won't see me, I'm going to go ahead and leave now and get to Flowers, because I know that's where my OB is and I know they'll see me there." She then turned to her husband and said, "We're going to Dothan. . . . We're going to Flowers. They're not going to see me here." Mr. Henderson then asked the clerk why they

---

[2] Mr. Henderson stated that he arrived while the clerk was recording Mrs. Henderson's personal information.

would not see Mrs. Henderson and she replied that the policy was generally not to see OB patients that are not patients of the OB doctors who practice there. The clerk said, "You can wait until we page the doctor on call, but he may choose not to see you or not to see her." Mr. Henderson said, "That's horse crap." The clerk then said, "I'm sorry, that's all I can do." Mrs. Henderson said, "I don't want to take a chance and wait." The Hendersons then left MCE.

After leaving MCE, the Hendersons drove approximately 40 minutes to Flowers Hospital in Dothan. During the trip, Mrs. Henderson alleges that she was worried that something had happened to the baby during the car accident and that she might deliver the baby on the way. She was also experiencing the pain of having contractions every two minutes during the 40-minute drive. Mrs. Henderson was admitted to Flowers for observation and was discharged the next morning. Approximately one week later, Mrs. Henderson gave birth to a healthy infant.

The MCE's Policy and Procedure for obstetrical patients presenting to the ER states that:

    4.    If a patient is over 20 weeks gestation but has had no prenatal care, the ER staff will contact the OB physician on call for acceptance and orders determining patient placement for care. If delivery is imminent, transport directly to L&D and notify physician on call.
    5.    Patients 20 weeks gestation and over will go to L&D only if complaints are pregnancy related. Pregnancy related complaints may include . . . abdominal pain, cramping, contractions, tightening. . . .
    6.    Patients 20 weeks gestation and over who have non-pregnancy related complaints will be evaluated by ER physician. . . .
                d. MVA [motor vehicle accident] - evaluate for maternal

>trauma prior to sending to L&D for monitoring. Notify obstetrician. Check FHR in ER and notify obstetrician immediately if rate less than 110 or over 160.

At some point following the incident at MCE, Mrs. Henderson contacted the State to complain about MCE's treatment of her. The Center for Medicare and Medicaid Services of the Department of Health and Human Services (hereinafter "CMS") then conducted an investigation into the incident. During ths course of the investigation, CMS interviewed a number of MCE personnel.

The registration clerk on duty when Mrs. Henderson arrived at MCE stated that upon arrival Mrs. Henderson told her that she was 37 weeks pregnant, had been in a motor vehicle accident that day, and was having contractions two minutes apart since the accident. Mrs. Henderson also said that the obstetrician on call for her physician advised her to go to the nearest ER. The clerk stated that she immediately called the L&D nurse. The L&D nurse asked who Mrs. Henderson's doctor was and when she found out that the doctor was not on staff, the nurse stated that she would have to verify with the doctor before they could treat Mrs. Henderson. The clerk stated that she did not notify the ER triage nurse about Mrs. Henderson or the reason she presented to the ER.

The L&D nurse who was called by the clerk stated that she assumed that when Mrs. Henderson came through the ER, the ER staff has triaged her before they called L&D. The same nurse also reported that a colleague of hers (another nurse) had received a call from Dr. Patel stating that Mrs. Henderson had been in a motor vehicle accident and was coming

7

to MCE for evaluation. The ER physician on duty at the time Mrs. Henderson arrived stated that, "Someone like that would be seen immediately and OB would be called." Two nurses agreed that a patient like Mrs. Henderson would normally be seen first by the ER physician, then by L&D. The ER staff on duty at the time confirmed that they were not notified of Mrs. Henderson.

The investigation also found that the facility staff failed to document informing Mrs. Henderson of the risks of her leaving MCE and the benefit of her not leaving MCE.

### IV. Discussion

*A.     EMTALA Claim*

The EMTALA imposes two requirements on hospitals that have entered into Medicare provider agreements. First, Section 1395dd(a) provides that "hospitals with an emergency medical department must provide an appropriate medical screening to determine whether an emergency medical condition exists for any individual who comes to the emergency medical department requesting treatment." *Gardner v. Elmore Community Hosp.*, 64 F. Supp 2d 1195, 1201 (M.D. Ala. 1999). "A hospital fulfills this duty if it utilizes identical screening procedures for all patients complaining of the same condition or exhibiting the same symptoms." *Id.* Second, Section 1395dd(b) provides that if the hospital determines that the individual has an emergency medical condition, the hospital must either provide further medical examination and treatment required to stabilize the medical condition or transfer the individual to another medical facility if transfer is appropriate. *See*

42 U.S.C. § 1395dd(b).  A hospital is deemed to meet the requirement to stabilize the individual if

> the hospital offers the individual the further medical examination and treatment . . . and informs the individual . . . of the risks and benefits to the individual of such examination and treatment, but the individual . . . refuses to consent to the examination and treatment.  The hospital should take all reasonable steps to secure the individual's . . . written informed consent to refuse such examination and treatment."

42 U.S.C. § 1395dd(b)(2).

Mrs. Henderson first alleges that MCE failed to provide an appropriate medical screening as required by 42 U.S.C. § 1395dd(a).

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. *See Baber v. Hospital Corp. of Am.,* 977 F.2d 872, 879 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991). The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly.

*Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995).  The MCE policy for obstetrical patients presenting to the ER states that patients over 20 weeks gestation who were involved in a motor vehicle accident should be evaluated by an ER physician prior to being sent to L&D.  Several members of the ER staff stated that patients in Mrs. Henderson's condition would ordinarily be seen by an ER physician before L&D was contacted.  It is undisputed that Mrs. Henderson was never seen by an ER physician.  Therefore, a jury could conclude that MCE did not follow its policy when dealing with Mrs.

9

Henderson. In addition, a jury could find that Mrs. Henderson was treated differently from other patients presenting with the same symptoms because her obstetrician did not practice at MCE. This difference in treatment not based upon a difference in symptoms would violate MCE's obligation under EMTALA to provide appropriate medical screening. Therefore, the Court finds that there is a genuine issue of material fact as to whether MCE provided an appropriate medical screening, thus summary judgment on this claim is due to be denied.

Mrs. Henderson's second claim is that by failing to provide treatment to Mrs. Henderson until the on-call obstetrician decided whether or not he would see her, MCE unduly discouraged her from remaining for further evaluation. EMTALA prohibits a hospital form delaying medical screening or treatment in order to inquire about the individual's method of payment or insurance status. 42 U.S.C. § 1395dd(h). However, a hospital is permitted to implement "reasonable registration processes" so long as the inquiry does not unreasonably delay screening or treatment and does not unduly discourage individuals from remaining for further evaluation. *See* 42 C.F.R. § 489.24(d)(4)(iv). Viewing the facts in the light most favorable to Mrs. Henderson, a jury could conclude that having to wait for the OB physician on call to decide whether or not Mrs. Henderson could be treated unreasonably delayed screening or treatment. A jury could also find that waiting for the OB physician unduly discouraged Mrs. Henderson from remaining for further evaluation, as the evidence shows that Mrs. Henderson decided to leave when she found out

that she would have to wait for approval to be seen. Therefore, the Court finds that summary judgment on this claim is due to be denied.

In defense of both the appropriate medical screening and undue delay allegations, Defendant asserts that Mrs. Henderson voluntarily withdrew her request for treatment, and therefore MCE fulfilled their obligations under EMTALA. In support of this claim, Defendant cites *Johnson v. Nacogdoches County Hospital*, 2003 WL 21999408 (Tex. App. Aug. 20, 2003), in which the court found that the plaintiff left the hospital voluntarily and thus had no EMTALA claim. The facts of *Johnson*, however, are distinguishable from the present case. In Johnson, the plaintiff was immediately met by a nurse who made a rapid assessment of her condition, then was later examined by the triage nurse. When the plaintiff attempted to leave the hospital, the triage nurse followed her to the parking lot and told her that the hospital would see her. The plaintiff nonetheless decided to leave. *Id.* In the present case, Mrs. Henderson was never examined by any hospital personnel and no one attempted to stop her from leaving or told her that she would be seen. Furthermore, though a hospital is deemed to have met EMTALA's requirements if a patient refuses to consent to treatment, *see* 42 U.S.C. § 1395dd(b)(2), there is a question of fact as to whether MCE met all of the Section 1395dd(b)(2) requirements. Section 1395dd(b)(2) requires the hospital offer the individual further examination and/or treatment and to inform the individual of the risks and benefits of such examination/treatment. If the individual then refuses to consent, the hospital is required to take "all reasonable steps" to secure the individual's written

11

informed consent to refuse examination/treatment. 42 U.S.C. § 1395dd(b)(2). It is not clear from the facts whether MCE took any of these steps, therefore MCE cannot claim that it complied with EMTALA as a matter of law because Mrs. Henderson voluntarily refused treatment.

*B.     Damages*

Defendant claims that even if it violated EMTALA, Mrs. Henderson has not suffered damages sufficient to support a private right of action under EMTALA. EMTALA provides that an individual who suffers personal harm as a result of a hospital's violation may obtain "those damages available for personal injury under the law of the State in which the hospital is located." 42 U.S.C. § 1395dd(d)(2)(A). It is undisputed that Mrs. Henderson is not seeking damages for any physical injuries, but is only seeking damages for mental/emotional injuries.

Alabama law applies a "zone of danger" test to claims for emotional damages, permitting recovery for such damages only if the plaintiff suffered actual or imminent risk of physical harm. *See Hardesty v. CPRM Corp.*, 391 F. Supp. 2d 1067, 1072 (M.D. Ala. 2005). Mrs. Henderson alleges that she was at imminent risk of physical harm by MCE's failure to administer medical care to her. She alleges that she was afraid that she was about to deliver the baby because the contractions were so fast . She further alleges that she was worried that something had happened to the baby during the accident and that something further would happen if she were not admitted. In addition, during the drive to Flowers, she

was worried that she was going to deliver the baby before reaching Flowers. Under Alabama law, whether a plaintiff may recover for emotional distress (*i.e.*, whether it was reasonably foreseeable that she would be placed at risk of physical injury and whether she in fact suffered emotional distress) is a question for the trier of fact. *See AALAR, Ltd. v. Francis*, 716 So. 2d 1141, 1147 (Ala. 1998). Thus, it is for the jury to decide whether Mrs. Henderson can recover damages for emotional distress as a result of the alleged EMTALA violation.

## V. Conclusion

For the reasons set forth above, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Doc. # 19) is DENIED.

DONE this the 14th day of August, 2006.

          /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE